Filed 7/23/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN CARLOS BENITEZ-TORRES,<br><br>    Defendant and Appellant. | G063400<br><br>(Super. Ct. No. 15NF0238)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Larry Yellin, Judge. Reversed and remanded with directions.

Jo Pastore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Sharon L. Rhodes and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Under Penal Code section 1473.7, a person may move to have a guilty plea vacated, and then be subject to a trial on the charges.[1] The movant must generally establish (1) he did not meaningfully understand the immigration consequences of the guilty plea, and (2) he was prejudiced thereby (there is a reasonable chance he would have rejected the plea). Prejudice is evaluated under the totality of the circumstances. (*People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*).)

In January 2015, Juan Carlos Benitez-Torres (Benitez) was 37 years old, his wife was a United States citizen, and he had five children. Benitez was a lawful permanent resident who was brought to this country at 12 years old. Police stopped a car Benitez was driving, ostensibly because of a tinted window. The car was not registered to Benitez. Police did a search of the car and found methamphetamine in hidden compartments.

The People charged Benitez with narcotics offenses. Benitez's family hired attorney Kenneth Reed for $15,000. Over the next few months, five other attorneys appeared on his behalf. One of them waived a preliminary hearing. Reed only appeared four times on the case, he did not file a motion to suppress the evidence, and Reed appears to have conducted essentially no investigation.

In August 2015, Reed advised Benitez to accept a three-year offer from the trial court. At that time, Reed had an obligation to understand and accurately explain the immigration consequences of guilty pleas to noncitizen clients. (See *Padilla v. Kentucky* (2010) 559 U.S. 356, 360 (*Padilla*).) Benitez pleaded guilty and was deported following his release from custody.

In January 2023, Benitez filed a section 1473.7 motion. At a

---

[1] Undesignated statutory references are to the Penal Code.

hearing, Reed testified that he did not recall the case, but he ordinarily advised clients with immigration issues that they may "need to hire an immigration attorney." The trial court denied Benitez's motion.

Under an independent standard of review, we find it likely that Benitez did not meaningfully understand the immigration consequences of his plea, and there is a reasonable chance Benitez would have rejected the plea, and taken his chances at a trial (or at least at a motion to suppress the evidence), if he had meaningfully understood those consequences.

Thus, we reverse the order of the trial court, which was a denial of Benitez's section 1473.7 motion. On remand, we direct the trial court to vacate Benitez's convictions, and then to set the matter for trial.

I.

FACTS AND PROCEDURAL HISTORY

On January 26, 2015, at about 4:20 p.m., a deputy was on patrol with his narcotics dog. The deputy saw a 2004 black Honda car with a dark tinted window on the driver's side and initiated a traffic stop.[2]

The deputy asked for Benitez's license, registration, and insurance. Benitez said he had just purchased the car and had a pink slip signed by Javier H., but he did not have the car's registration or proof of insurance. According to the police, Benitez consented to a search of the car (Benitez told Reed he did not consent).

Two corporals, two more deputies, and a narcotics investigator eventually arrived on the scene. Benitez was searched and placed in the back of a vehicle. A records check revealed Benitez had no outstanding arrest

---

[2] The facts are taken from police reports.

3

warrants. The car was registered to Javier H. with a Fullerton address.

The dog alerted to the presence of illegal narcotics. Hidden traps were found behind the car's dashboard and center console. Just over four kilos of methamphetamine was found hidden in the passenger compartment and in the trunk. Benitez was arrested and made no statements (the length of the detention and the search is not detailed in the reports).

*Initial Court Proceedings*

The People filed a complaint charging Benitez with knowingly possessing a controlled substance for purposes of sales, and knowingly transporting a controlled substance. The People alleged the controlled substance (methamphetamine) exceeded four kilograms.

On January 28, 2015, the trial court appointed counsel to represent Benitez, who was assisted by an interpreter. Benitez pleaded not guilty, and the court set bail at $1 million.

On February 5, Benitez appeared in court with his appointed counsel. The date of the preliminary hearing was continued.

On February 9, Benitez appeared in court with his appointed counsel. The date of the next hearing was continued.

On February 26, Benitez appeared in court with a retained attorney, Reed, who substituted in as attorney of record. The date of the preliminary hearing was vacated, and the matter was continued.

On March 12, Benitez appeared in court with Reed, who continued the next hearing date.

On April 13, Benitez appeared in court for a continuance with attorney Richard Curran who specially appeared for Reed.

On June 4, Benitez appeared in court for a continuance with

4

attorney Margaret Mendenhall who specially appeared for Reed.

On July 17, Benitez appeared in court for a continuance with attorney Christine Simmons who specially appeared for Reed.

On July 27, Benitez appeared in court with attorney Jack N. Whitaker, who specially appeared for Reed. The court found Benitez knowingly and voluntarily waived his right to preliminary hearing. Whitaker joined in the waiver of Benitez's statutory rights.

On August 4, the People filed an information alleging the same charges and enhancement alleged in the complaint.

On August 5, Benitez appeared in court with Reed. The court arraigned Benitez on the information and set a trial date.

On August 19, Benitez appeared in court for a continuance with attorney Ernest Eady who specially appeared for Reed.

*The Guilty Pleas*

On August 26, 2015, Benitez appeared in court with Reed. Before the case was called, Benitez had signed and initialed numerous paragraphs in a seven-page felony plea form indicating that he was pleading guilty to the charged crimes and the sentencing enhancement. The form was also signed by Reed, and a court-certified interpreter.

The document was filled in by hand, in part, stating that the maximum total sentence was nine years in prison; however, Benitez was pleading to the court, which indicated it would impose a three-year sentence (this was not a negotiated plea with the district attorney). The factual basis of the plea form was also filled in by hand (there is no evidence this was written by Benitez), stating: "I willfully & unlawfully transported and possessed for sale over 4 kilograms of methamphetamine."

5

The form document included the following preprinted language: "**Immigration consequences**: I understand that if I am not a citizen of the United States, my conviction for the offenses charge will have the consequences of deportation, exclusion from the United States, or denial of naturalization pursuant to the laws of the United States."

The plea form also included separate preprinted paragraphs waiving Benitez's trial rights: the right to a jury trial, the right to confront witnesses, the right to testify in his own defense, and the right to present evidence in his favor. The plea form also included preprinted waivers of Benitez's Fourth Amendment rights against unreasonable governmental searches and seizures, a waiver of his right to have a jury determine certain sentencing factors, a waiver of his right to appeal "from all decisions and orders made in my case," and a waiver of his right to the preparation of a probation report prior to sentencing.

Benitez initialed the above paragraphs as well as 19 additional preprinted provisions (e.g., court operations fees, laboratory analysis fees, drug program fees, DNA sample and testing requirements, the requirement to register as narcotics offender, etc.).

Reed signed the following statement: "I am the attorney of record for defendant. I have explained to defendant each of the rights set forth on this form. I have discussed the charges and the facts with defendant. I have studied the possible defenses to the charges and discussed those possible defenses with defendant. I have discussed the possible sentence ranges and immigration consequences with defendant. I also have discussed the contents of this form with defendant."

The trial court called the matter, and made inquiries of Benitez: "You have a right to a jury trial, to confront and cross-examine witnesses

6

should you have a trial, to testify or not depending on your choice, and the right to the court' s free services to subpoena witnesses. [¶] If you are not a citizen, you will hereafter be deported, denied naturalization or excluded from the U.S. [¶] Do you understand those rights and agree to waive or give those rights up in order to enter your plea of guilty?"

After Benitez responded in the affirmative, the court asked, "To the charges how do you plead, sir?" Benitez said, "Guilty." The court said, "A plea of guilty is entered, did we get a resounding guilty in?" After inquiring of Reed, Benitez again stated, "Guilty." The court said, "Everybody says guilty, I love the word, that is why I asked again." The court then imposed the indicated sentence of three years, with credit for time served (212 actual days, plus 213 conduct credits). [3]

*The Section 1473.7 Motion*

On May 3, 2023, Benitez filed a section 1473.7 motion to vacate his 2015 drug convictions. The People filed an opposition. Benitez later filed a reply and a request for an evidentiary hearing.

Benitez averred that he was born in Mexico in 1977, he was brought to the United States when he was 12 years old. Benitez attended junior high school, but later dropped out of high school. Benitez married his first wife and fathered four children who are United States citizens. Benitez later divorced, married his second wife, and fathered another child. Benitez's second wife is a United States citizen who helped Benitez obtain his status as a lawful permanent resident on March 26, 2009.

---

[3] The trial court judge who took Benitez's plea in 2015 (Robert R. Fitzgerald), is not the same the trial court judge who denied his section 1473.7 motion in 2023 (Larry Yellin).

"I cherish my status as a lawful permanent resident. I wanted to give back to the United States, the country I love. I started volunteering at the Nixon Library, Yorba Linda, California. I wanted to become a U.S. citizen. [¶] . . . Unfortunately, on or about January 26, 2015, I was arrested for" drug offenses. (Health & Saf. Code, §§ 11378, 11379.)

"I was driving a car that somebody asked me to drive from Orange County to Los Angeles. The car was not registered in my name. As I drove the car onto the freeway for a few minutes, I saw helicopter and then the sheriff department pulled me over. The police asked me to consent to the search of the car, but I refused and told them that it was not my car. Despite the foregoing, the police went ahead and ripped the car's dashboard and found controlled substance in the car. I was then arrested for transportation of controlled substance."

Benitez stated that initially he was represented by a public defender, but "with my family's assistance, I hired Mr. Kenneth Reed, a private attorney to represent me."

"I was in jail from January 2015 to August 2015 because I couldn't make bail. Apart from talking to me in court for a few minutes, Mr. Reed never came to interview me and get my side of the story so that he could adequately defend me. [¶] . . . Rather, on about five of the seven court dates, I was brought to court only to discover that Mr. Reed was absent. An attorney that I have never met before will then stand up to say that they are making special appearance for Mr. Reed sometimes because Mr. Reed was out of town or had another case somewhere else. These attorneys state to the court that their sole purpose is to postpone my case on Mr. Reed's behalf. These attorneys never spoke with me about the issues in my case or expressed any familiarity with my case. They just ask for continuance."

8

"Finally, Mr. Reed showed up for the August 26, 2015 court hearing and told me to plead guilty. He told me that I will be sentenced to three years in custody. That was the same exact offer the Public Defender got for me after just two hearings. [¶] . . . I told Mr. Reed that I am a lawful permanent resident of the United States. [¶] . . . On the day Mr. Reed told me to plead guilty, . . . I was given an advisement in English and a Spanish interpreter was translating for me. However, my attorney Mr. Reed never advised me that my plea was an aggravated felony which meant I was basically guaranteed to be deported, excluded from the United States, and denied naturalization."

On October 6, 2013, the trial court denied Benitez's motion after an evidentiary hearing (the relevant evidence and the trial court's ruling will be covered in detail in the discussion section of this opinion).

## II.

## DISCUSSION

Benitez claims that he did not meaningfully understand the immigration consequences of his 2015 guilty pleas, and he was prejudiced thereby. Given the totality of the circumstances, we agree.

We apply an independent standard of review. (*Vivar, supra,* 11 Cal.5th at pp. 524–528.) Under this standard, "an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." (*Id.* at p. 527.) The reviewing court is to give deference to any "factual findings based on the trial court's personal observations of witnesses." (*Id.* at pp. 527–528.) However, this deference does not apply to facts derived "from written declarations and other documents." (*Id.* at p. 528.) "Ultimately it is for the appellate court to decide, based on its independent judgment, whether

9

the facts establish prejudice under section 1473.7." (*Ibid.*)

In this discussion, we shall: A) review the relevant principles of law; B) summarize the proceedings in the trial court; and C) analyze the facts as applied to the law under an independent standard of review.

## A. *Relevant Principles of Law*

In 2010, the United States Supreme Court held that criminal defense attorneys have an affirmative obligation to understand and accurately explain the immigration consequences of a guilty plea to their noncitizen clients. (*Padilla, supra,* 559 U.S. at p. 360 ["While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms over time have expanded the class of deportable offenses and limited the authority of judges to alleviate the harsh consequences of deportation"].)

Consistent with the Supreme Court's 2010 holding in *Padilla,* effective January 1, 2016, the Legislature augmented the Penal Code, stating that immigration consequences "may be by far the most serious penalty flowing from the conviction." (§ 1016.2, subd. (c).) "It is the intent of the Legislature to codify [*Padilla*] and related California case law and to encourage the growth of such case law in furtherance of justice and the findings and declarations of this section." (§ 1016.2, subd. (h).)

"'Defense counsel shall provide accurate and affirmative advice about the immigration consequences of a proposed disposition, and when consistent with the goals of and with the informed consent of the defendant, and consistent with professional standards, defend against those consequences." (§ 1016.3, subd. (a).)

Effective January 1, 2017, the Legislature also created an

10

ameliorative remedy for criminal defendants: "A person who is no longer in custody may file a motion to vacate a conviction or sentence for any of the following reasons: [¶] (1) The conviction or sentence is legally invalid due to a prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence. *A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel.*" [4] (§ 1473.7, subd. (a)(1), italics added.)

"Prejudicial error may result from 'the moving party's *own* mistake of law or inability to understand the potential adverse immigration consequences of the plea.' [Citations.] At the heart of the prejudicial error analysis 'is the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken.'" (*People v. Lopez* (2022) 83 Cal.App.5th 698, 713–714 (*Lopez*).)

Our Supreme Court has held that "showing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a *reasonable probability* that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Vivar, supra,* 11 Cal.5th at p. 529, italicized added.)

"'"A 'reasonable probability' 'does not mean more likely than not, but merely *a reasonable chance*, more than an abstract possibility.'"'" (*Lopez, supra,* 83 Cal.App.5th at p. 714, italics added.) "'When courts assess whether a petitioner has shown that reasonable probability, they consider the totality

---

[4] The italicized portion was added by amendment. Prior to that, courts had routinely interpreted section 1473.7 to *require* that defendants must prove ineffective assistance of counsel in order to obtain relief under the statute. (See *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).)

11

of the circumstances. [Citation.] Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible.'" (*Ibid*.)

"And while the probability of obtaining a more favorable result at trial may be one factor a court considers in determining prejudice, it is not controlling or necessarily even the most important factor courts consider. [Citations.] Indeed, the United States Supreme Court has declared that where avoiding deportation was *the* deciding factor for a defendant, there is a reasonable probability that such a defendant 'would have rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a "Hail Mary" at trial.'" (*Lopez*, *supra*, 83 Cal.App.5th at pp. 714–715.)

Mandatory removal from the United States is a consequence of being convicted of a crime deemed an aggravated felony under federal immigration law. (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 187–188 (*Moncrieffe*) [an aggravated felon is "conclusively presumed" deportable]) And long-standing federal "precedents hold that whether a state classifies an offense as a "misdemeanor" is irrelevant to determining whether it is an "aggravated felony" for purposes of federal law." (*Habibi v. Holder* (9th Cir. 2011) 673 F.3d 1082, 1088.)

"[A] conviction of Health and Safety Code section 11360, subdivision (a), is not an aggravated felony under immigration law if the record of conviction . . . shows that the defendant was convicted of 'offering' to transport, sell, furnish, or give away a controlled substance." (*People v. Bautista* (2004) 115 Cal.App.4th 229, 238, fn. 6.)

12

## B. The Hearing on the Section 1473.7 Motion

Prior to the section 1473.7 hearing, Benitez had subpoenaed Reed's records concerning his case. Benitez's wife signed a retainer agreement, which was "through the completion of pre-trial negotiations only." Reed's legal services were purported to include an investigation and the filing of pretrial motions; however, Reed's obligations were to be discharged when Benitez pleaded guilty and was sentenced. Reed was to be paid $15,000 in total ($2,000 immediately, $5,000 by the following month, and $1,000 per month for the next eight months).

In the subpoenaed records there was an undated memo to file stating the People's offer was a four-year split sentence, and the court's offer was a three-year sentence in local custody.[5] There were handwritten notes on a document dated February 26, 2015 (the first time Reed appeared in court), which state, in part: "No consent to search. Just bought the car 30 minutes prior. He buys and sells cars." The records contain no evidence of any substantive investigation of the underlying facts, no additional notes concerning the traffic stop, and no thorough interview of Benitez.

On September 29, 2023, the matter was called for a hearing. The court indicated that Reed's documents on Benitez's case had been received through a subpoena duces tecum (SDT), and the court stated it would release the documents to the parties. After a recess, the People noted that Benitez had provided no declaration from Reed. Benitez's counsel indicated Reed had

---

[5] Under section 1170, subdivision (h), qualified nonviolent defendants can serve their sentences in local custody for nonviolent crimes. "'A split sentence is a hybrid sentence in which a trial court suspends execution of a portion of the term and releases the defendant into the community under the mandatory supervision of the county probation department.'" (*People v. Avignone* (2017) 16 Cal.App.5th 1233, 1240.)

13

initially "agreed to sign a declaration. [¶] I prepared a declaration and e-mailed it to him and four, five months later, he didn't sign the declaration."

Counsel explained to the court that this was why he resorted to using the SDT. The court asked, "You would like to subpoena [Reed] to testify?" Counsel responded, "I already did, your honor." The court asked, "Are you asking me to intervene on the fact that he is not currently here to testify?" Counsel responded, "Yes, your honor, please." The court then put the matter over to the afternoon calendar.

Reed later appeared in court and testified. Reed said he had been a criminal defense attorney for 33 years, and that he had done immigration work a couple of times incidental to criminal matters.

Reed said that he had represented Benitez, and when he was asked if his representation was after a public defender had already appeared on the case, Reed responded, "I don't remember. But I can look at the record and see if it was a P.D., but you could have done that as well. [¶] So are you asking me because you want to know the answer or are you asking me because you want to know if I know the answer?"

When asked about his recollection of the case, and to rate his memory from one to ten, Reed said, "Well, I wouldn't give it any number because if my recollection of the case was important, I would -- I would read the case and it would be based upon what I read." When asked what he generally remembered, Reed responded: "I've tried a number of cases since then, counsel. What do you want to know?"

After further colloquy, counsel asked the trial court, "Could the court kindly direct Mr. Reed to answer my question? I don't want to be forced to ask the court to rule him a hostile witness, but I'm just trying to get answers to the question."

14

Reed eventually testified that he had no independent recollection of Benitez's case. Reed said the documents he had submitted pursuant to the subpoena were his complete records on the matter. Counsel asked, "Did you recall or did you document anywhere the immigration status of Mr. [Benitez]?" Reed answered, "No, but I would have asked him at some point."

When asked whether he discussed a disposition that might have involved a nondeportable offense (a charge that was not an aggravated felony), Reed said, "I always talk to the prosecutor about settling the case. From my quick reading of this case . . . it says that there were four kilos of methamphetamine, in this county and any county I've ever practiced law in, that ain't ever going to get you a misdemeanor short of you cooperating and snitching somebody off, which wasn't on the table in this case. [¶] So that prosecutor was talking about prison time."

Reed went on to say: "So my understanding of my way of practicing law . . . would necessitate a conversation of me dealing with his immigration situation. I.e., were you born in the United States? That's generally where I go. [¶] And I'm not an immigration attorney. That's usually what I say. You may need to hire an immigration attorney if that's what your concern is in this case."

Reed clarified, "If that issue comes up. But I also have to advise them that there are immigration consequences with pleading guilty to a felony. I may even talk to them about factually having four kilos of methamphetamine and crossing the border . . . presumably being . . . [an] . . . alien in the United States is not generally something conducive to staying in the United States. [¶] But you may need to hire an immigration lawyer on the issues of your deportation. That is not why I am here. And that is the legal requirement that I have. [¶] I'm not required to practice immigration

15

law. There's no immigration law forms in a state court plea agreement. There's no immigration law requirements in a state court plea agreement."[6]

Reed testified that he would have spoken to Benitez with the aid of an interpreter, but he did not remember whether he ever visited Benitez and spoke to him while he was in custody.

Benitez testified largely consistent with his declaration. Benitez told Reed that he "was a resident and I didn't want to lose that. He told me that he practiced immigration law as well but he told me to wait until that moment came along." "What he told me was to take care of the jail matter first, and then afterwards, we can look into the immigration matter." Benitez testified that he could only recall seeing Reed in court when he was first hired, and then at sentencing. Benitez said Reed had "told me to initial here, initial here, initial here and then sign it, and that was it. So I told him, hey, what's this about? When they said three years. And he got upset. He told me not to speak in front of a certain cellmate . . . ."

After the interpreter interrupted, Benitez said, "Okay. What happened is I was warned that I might not want to testify regarding other inmates because there was a dangerous inmate in there. So I was scared. I got scared. He told me he wasn't going to be able to help me out because I wasn't willing to testify." The court interrupted, "I'm sorry, let me get a clarification. When you say 'He wasn't able to help me out because I wasn't willing to testify,' is this a discussion you had with Mr. Reed?" Benitez confirmed that he spoke to Reed, but this conversation occurred in the back of the courtroom "for only three minutes."

---

[6] There was never an allegation or any indication that Benitez had been "crossing the border" with methamphetamine.

Counsel asked, "Was that the first time you were hearing three years regarding your case?" Benitez responded, "That's what the public defender gave me the -- since the beginning. The first time." Benitez said that Reed never told him that he was pleading guilty to aggravated felonies, and that as a result he would forever be excluded from entering the United States. As far as the immigration advisement, Benitez testified that Reed "told me to initial it, sign it, but he never explained it to me."

After a brief cross-examination, the court asked some questions. The court confirmed that Benitez's conversations with Reed all took place in the courthouse and that Reed never came and visited him in jail. The court asked Benitez whether he remembered filling out a six-page form. Benitez said that he thought it was one page, but after being shown a copy of the form, he said, "These initials [on] this page, they are mine. But that's not my writing. I'm not able to write in English. And that's not my writing on this page either." After mistakenly identifying the interpreter's signature, Benitez confirmed that the signature on the form was his signature.

After taking the matter under submission, the court denied the motion. The court said that the evidence showed Benitez had "told Mr. Reed at the very first meeting that there was an immigration issue. I think he noted that there was a permanent -- and this is from [Benitez's] testimony. That there was a discussion about that issue.

"I probably find it fairly not credible that Mr. Reed's answer was something along the lines of he was an immigration attorney and he would deal with it later. But there was at least a discussion regarding immigration status by [Benitez's] own testimony.

"The other thing [Benitez] testified is that then he was just told to go out, take the three years, and plead guilty. That he didn't fill out forms.

17

"I showed [Benitez] a copy of the -- I believe it's a six-page Tahl form with his initials all over it. And while I recognize that he did, in looking at it, admit that those were his initials and ultimately in looking at the signature line -- the correct signature line, because the testimony first is he was looking at the interpreter's signature line, but that it was his signature.

"It's just not credible evidence. And it could be a failed memory, but it's still not credible evidence to carry the day that there was not the consideration of immigration consequences. There was the paragraph read -- initialed and read in open court and the court just finds that there's insufficient evidence on behalf of [Benitez], whether it's through his declaration and/or his testimony, to carry the motion. Therefore, the motion is denied."

## C. Application and Analysis

In this case, Reed testified that he did not remember Benitez's case specifically, but he generally advised noncitizen clients: "You may need to hire an immigration attorney if that's what your concern is in this case." At that time Reed did not have a statutory obligation to "provide accurate and affirmative advice about the immigration consequences of a proposed disposition." (See § 1016.3, subd. (a)(1).) However, Reed's testimony arguably establishes that his legal representation fell below an objective standard of reasonableness given the United States Supreme Court's prior holding in *Padilla*. (See *Padilla*, *supra*, 559 U.S. at p. 360 [defense attorneys have an affirmative obligation to understand and accurately explain the immigration consequences of a guilty plea to their noncitizen clients].)

Reed only appeared on Benitez's case four times. Reed did not participate in a preliminary hearing (in fact, he left it to another attorney to

18

explain to Benitez that he needed to waive his statutory right to a preliminary hearing). Reed never filed a motion to suppress evidence, and based on the lack of documents in Benitez's subpoenaed case file, it appears Reed never conducted any kind of meaningful investigation of the facts.

In any event, a finding of ineffective assistance of counsel under the Sixth Amendment is not required for Benitez to prevail in a section 1473.7 motion. "The Legislature has clarified that the moving party need not establish ineffective assistance of counsel. (§ 1473.7 subd. (a)(1).) It follows therefore, that even if the motion is based upon errors by counsel, the moving party need not also establish a Sixth Amendment violation as by demonstrating that 'counsel's representation "fell below an objective standard of reasonableness"' . . . '"under prevailing professional norms,"' as stated in *Padilla, supra,* 559 U.S. at pages 366, 368–369, quoting *Strickland, supra,* 466 U.S. at pages 688, 694 . . . ." (*People v. Camacho* (2019) 32 Cal.App.5th 998, 1008–1009 (*Camacho*).)

"Defendant was required only to show that one or more of the established errors were prejudicial and damaged his 'ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of [his] plea . . . .' (§ 1473.7, subd. (a)(1).) If it were otherwise, we would have to engage in an analysis that the Legislature never meant to require, which in turn, would render the statute meaningless." (*Camacho, supra,* 32 Cal.App.5th at p. 1009.)

Benitez testified that he did not understand that the narcotics charges he was pleading guilty to (possession for sales and transportation of a controlled substance) were aggravated felonies under federal law, which require mandatory deportation. (See *Moncrieffe, supra,* 569 U.S. at pp. 187–188.) Benitez's testimony in this regard is bolstered by Reed's testimony that

19

he routinely advised noncitizen defendants to consult with immigration attorneys. Based on his testimony, Reed appeared to be wholly unaware of what constituted an aggravated felony under federal law. Reed also seemed to mistakenly focus on the fact that Benitez was pleading guilty to felony crimes rather than misdemeanor crimes; however, a state's classification of crimes is not of paramount concern under federal immigration laws, the critical issue is whether the crime is an *aggravated* felony or not. (See *Habibi v. Holder, supra,* 673 F.3d at p. 1088.)

In sum, given Benitez's unrefuted testimony, and all of the surrounding circumstances that generally support his testimony, we find there is reasonable probability that Benitez did not meaningfully understand the immigration consequences of his guilty plea (mandatory deportation).

The Attorney General argues that the felony "plea form correctly informed [Benitez] that he would be removed." We agree, but such advisements are not a categorical bar to relief under section 1473.7.

An immigration advisement in a felony plea form "did not absolve defense counsel of the duty to advise of immigration consequences. Even where the form says that the defendant 'will' be deported, it does not substitute for the advice of counsel, and it is not a categorical bar to relief. "'Although the [plea] form contains the word 'will' and not 'may,' it, standing alone, is akin to the 'generic advisement' required of the court under Penal Code section 1016.5 . . . and it similarly 'is not designed, nor does it operate, as a substitute for such advice' of defense counsel regarding the applicable immigration consequences in a given case.'"" (*People v. Manzanilla* (2022) 80 Cal.App.5th 891, 906.)

Here, the immigration advisement was one of a multitude of advisements initialed by Benitez in the lengthy felony plea form. Benitez's

20

unrefuted testimony was that Reed only presented the document to him several minutes before he signed it. Given Reed's apparent lack of knowledge about federal immigration laws, and his apparent lack of knowledge regarding his obligations under *Padilla*, we find that the written advisement in the lengthy plea form does not refute Benitez's testimony that he did not meaningfully understand the immigration consequences of his guilty pleas.

As far as the second factor (prejudice), there is corroborative evidence to substantiate Benitez's claim that he would not have pleaded guilty had he meaningfully understood the mandatory immigration ramifications. At the time of his guilty plea in August 2015, Benitez was 38 years old and had been in the United States since he was 12 years old. Benitez was married, had five children, and was a lawful permanent resident of the United States. These facts tend to support Benitez's claim that remaining in the United States was of particular importance to him. (*People v. Espinoza* (2023) 14 Cal.5th 311, 320 ["Factors particularly relevant to this inquiry include the defendant's ties to the United States"].)

Another contemporaneous substantiation of Benitez's declaration is that unlike most guilty pleas, this was a direct plea to the trial court rather than a negotiated disposition. That is, it appears there was no meaningful negotiations with the prosecution. The court imposed an indicated sentence of three years. But had Benitez gone to trial and been found guilty, it is simply not realistic to imagine that the court would have imposed the maximum prison sentence of nine years. (See *In re Lewallen* (1979) 23 Cal.3d 274, 278-281 [under principles of due process, a trial court may not penalize a defendant for exercising his or her right to a jury trial, nor may it promise leniency if a defendant refrains from exercising that right].)

In other words, Benitez may have been inclined to take his

21

chances at trial, given a realistic assessment of his maximum exposure. Also, there were obvious reasons to challenge the search on Fourth Amendment grounds, and even if that was not successful, then there was a colorable trial defense (i.e., that Benitez may not have been *knowingly* in possession of the hidden narcotics in a vehicle that was not registered in his name).

Although the trial court's ruling is not entirely clear, the court appeared to find that Benitez's testimony was not completely credible. But the court's concern primarily appears to have been with Benitez's testimony regarding the particular details as to his signing of the plea forms several years prior. Indeed, there is no evidence that the factual basis in the plea form was in Benitez's handwriting, so the court's questions may not have been entirely clear to Benitez, who was being aided by an interpreter who then asked for clarification.

Bottom line, the trial court never explicitly found that Benitez meaningfully understood the immigration consequences of his guilty pleas. (See *Lopez, supra,* 83 Cal.App.5th at p. 714 ["At the heart of the prejudicial error analysis is the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken"].) And the trial court never explicitly found that there was not "a *reasonable probability* that" Benitez "would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Vivar, supra,* 11 Cal.5th at p. 529, italics added.)

In cases like this, where difficult and careful analysis is required, reasonable minds may sometimes differ. But in this review, we are called upon to exercise our *independent* judgment. (See *Vivar, supra,* at p. 527 ["Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7"].)

22

Given all the surrounding circumstances, we find Benitez has established that he did not meaningfully understand the immigration consequences of his plea, and there is a reasonable probability he would have rejected the trial court's offer and taken his chances at trial—or at least at a motion to suppress the evidence—had he meaningfully understood those mandatory consequences. (*Lopez, supra,* 83 Cal.App.5th at p. 714 ["""A 'reasonable probability' 'does not mean more likely than not, but merely *a reasonable chance*, more than an abstract possibility"""].)

## III.

## DISPOSITION

The order of the trial court is reversed, and the matter is remanded with directions to allow Benitez to withdraw his 2015 guilty pleas.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


DELANEY, J.

23